Argued and submitted July 16, affirmed December 5, 2001

Kristin A. ETTNER,
*Respondent,*

*v.*

CITY OF MEDFORD,
a Municipal corporation,
*Appellant.*

96-2123-L-3; A108631

35 P3d 1140

Michael O. Whitty argued the cause for appellant. On the opening brief were Robert E. Franz, Jr., and Law Office of Robert E. Franz, Jr. On the reply brief were Michael O. Whitty and Law Office of Robert E. Franz, Jr.

Lee S. Werdell argued the cause for respondent. With him on the brief was Werdell & Hanson.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

SCHUMAN, J.

**SCHUMAN, J.**

Plaintiff brought this unlawful employment practice claim against the City of Medford, alleging that the city unlawfully discharged her as a firefighter on the bases of gender and of perceived impairment. In a single proceeding, a jury found for the city on the perceived impairment claim, and the court found for plaintiff on the sex discrimination claim. The city appeals, and we affirm.

When the City of Medford hired Dave Bierwiler to be its fire chief in 1989, the Medford Fire Department employed no female firefighters, and one of Chief Bierwiler's goals was to change that situation. Following the announcement of his goal, Chief Bierwiler met with members of his senior staff, including Petersen and Burns. They reported to him that his enthusiasm for hiring a female could hurt morale. Consequently, although he had the *de facto* power to hire probationary firefighters permanently (subject to approval by the City Manager) and the *de jure* power to fire them, Chief Bierwiler agreed to the request of Petersen and Burns not to interfere with the evaluation process of any female firefighter the department might hire.

Plaintiff began work with the Medford Fire Department in August 1994. She had worked previously as a seasonal firefighter for the State of Oregon from 1985 through 1989 while attending Southern Oregon State College. After college, plaintiff again worked as a firefighter, first with the U.S. Forest Service and then for a private company in Josephine County for four years.

When she started the Medford job, some male firefighters reported that their wives were disturbed over the idea of gender-integrated quarters. Nonetheless, plaintiff satisfactorily completed her training year: She passed a rigorous physical exam, three written tests and 26 task tests. Plaintiff was "highly recommended for advancement to the non-probationary status" by Anderson, the battalion chief who had been in charge of her training.

On August 8, 1995, plaintiff faced the final task tests, her last obstacle to becoming a permanent firefighter.

All successful probationers must pass those tests, also called Firefighter I tasks, to become permanent firefighters. Probationers are given a set of five tasks, chosen from the 26 on which they have been trained and tested as probationary employees, and are graded by three evaluators on each task for both safety and accuracy. The three evaluators for plaintiff were Petersen, then the training chief of the Medford Fire Department, Anderson, plaintiff's battalion chief, and Hartzell, an outside evaluator who was fire chief for the City of Williams. When the averages on the final task tests were calculated, plaintiff failed all five, even though during training she had successfully performed all of them. There was one irregularity in the grading: Anderson was present at only three of the five tests, so two of plaintiff's task tests were graded by two persons rather than the required three. In addition, the evaluators conferred with each other before reporting plaintiff's score, and Anderson changed all three of his grades for accuracy by scratching out his initial grades and lowering them 10 points.

No male probationer had ever failed more than one task test. Those who did fail one were told what their error was and then immediately retested. Petersen and Chief Bierwiler, however, decided not to repeat all five tests that day because plaintiff was psychologically and physically drained. Rather, they decided to extend plaintiff's probation period and assign her to a station where she could be trained to take the task tests when they were next offered the following month. From August 15, 1995, to September 29, 1995, members of the department gave plaintiff one to six hours of training per day on the Firefighter I tasks.

Plaintiff was tested a second time on September 29, 1995. Petersen was once again one of the evaluators, along with Burns, who with Petersen had initiated the meeting where Chief Bierwiler was encouraged to distance himself from the evaluation of plaintiff, and Goodson, a battalion chief at the Medford Fire Department. No outside evaluator participated. Plaintiff took five task tests, none of which was a repeat of a test she had taken in August. The evaluators failed her on three. That same day, after a conversation with Petersen and Burns, Chief Bierwiler informed plaintiff in writing that she was being terminated because of her failures

on the day's tests. Plaintiff thereby became the only person in the collective memory of Medford Fire Department personnel who went though the probationary year passing all the tests and receiving a recommendation from the battalion chief, yet did not move on to nonprobationary status. In September 1996, plaintiff was hired by the City of Grants Pass Department of Public Safety. She successfully completed the probationary period there and passed the task tests to become a Firefighter I.

Plaintiff brought this action against the City of Medford for back wages, future wages and noneconomic damages under ORS 659.030 and ORS 659.121(1). ORS 659.030 provides, in pertinent part:

"(1)    [I]t is an unlawful employment practice:

"(a)    For an employer, because of an individual's * * * sex, * * * to * * * discharge from employment such individual. However, discrimination is not an unlawful employment practice if such discrimination results from a bona fide occupational requirement reasonably necessary to the normal operation of the employer's business."

ORS 659.121(1) provides, in pertinent part:

"Any person claiming to be aggrieved by an unlawful employment practice prohibited by ORS * * * 659.030 * * * may file a civil suit in circuit court for injunctive relief and the court may order such other equitable relief as may be appropriate[.]"

At the conclusion of a one-week trial, the court issued an opinion and order finding, in relevant part:

"The Court finds the Plaintiff to be professional, competent and credible. Based upon the Court's observation of the witnesses, their demeanor, and the evidence at trial, the Court resolves all factual disputes in Plaintiff's favor. * * * [T]he conclusion is inescapable that Plaintiff's performance on the task tests was held to a different and higher standard than that of the male firefighters, due solely to her gender. The Court finds that gender was a substantial factor in her termination."

The court correctly noted that its judgment in favor of plaintiff did not necessarily imply that defendants acted with ill

will. Citing *Winnett v. City of Portland,* 118 Or App 437, 847 P2d 902 (1993), the court wrote: "Plaintiff was required to prove that 'she was treated less favorably than male candidates because of sex. [That] is sufficient to establish discriminatory motive * * *.' " *Id.* at 443 n 2 (quoting *Hopkins v. Price Waterhouse,* 825 F2d 458, 469 (DC Cir 1987), *rev'd on other grounds* 490 US 228, 109 S Ct 1775, 104 L Ed 2d 268 (1989)). The court entered judgment in favor of plaintiff for back wages in the amount of $26,210, plus costs and reasonable attorney fees. This appeal followed.

■       The city assigns error to the court's conclusion that it discriminated against plaintiff on the basis of gender. Because an action for back pay under ORS 659.121(1) is one for equitable relief, *Winnett,* 118 Or App at 442, we review plaintiff's sex discrimination claim *de novo.* When the credibility of a witness is an important factor in deciding a factual issue, we give considerable weight to the court's finding on that issue and the inferences that it drew from the relevant facts. *Id.*; *State v. Watkins,* 35 Or App 87, 89, 581 P2d 90 (1978).

The city argues that the evidence presented at trial cannot support a finding that gender was a substantial and impermissible factor in its decision to terminate plaintiff, that is, that she was treated less favorably than male candidates because of her sex. *Winnett,* 118 Or App at 443 n 2. It maintains that her failure derived solely and impartially from the results of an objective testing process. Plaintiff maintains that the testing process was not objective and that her failing score on the task tests, combined with evidence of differential treatment, hostility toward her based on opposition to a gender-integrated firefighting force, and subsequent success on the tests when she took them for the Grants Pass department, support the inference that she was terminated because of her sex. We agree with plaintiff.

■       The court found, and we agree, that the grading was unfair to plaintiff because it was "highly subjective" and that "there was no evidence of any objective criteria for determining how failure or success in performing certain tasks or portions of a task were to be scored." The court concluded that "there was no objective basis for determining the number of

points one received on each of the task tests." Plaintiff's expert witness, Peters, the recently retired fire chief of the Thurston County Fire Department in Olympia, Washington, addressed the subjectivity of the Medford Fire Department's evaluation procedures. He criticized the Medford evaluation practice for its lack of a mechanism to quantify the various aspects of the tests. He also concluded, after having examined the spreadsheets of plaintiff's scores, that they were not only highly subjective, but suspicious. He further stated that an evaluation team without an outside member was not proper, as it allowed for too much internal bias, and he called the communication among the evaluators after each of plaintiff's tasks on her September 29 test "totally inappropriate."

Although we agree with the city that several components of many of the tasks are objective, *e.g.,* the size of the hole cut in a roof to ventilate a fire and the correct pressure for the foam eductor, the fact remains that no specific numerical value was assigned to any of them, so that the evaluators were free to emphasize or de-emphasize particular criteria on an ad hoc basis. One evaluator admitted that he could assign a specific component of a given task either one point or 50 and not indicate the values he was using or, alternatively, he could decide to give an overall number for each task without assigning particular values to different component parts of it. One evaluator appeared to use plus and minus signs and indicated in a deposition that those signs were shorthand evaluations, but later testified that the signs "didn't necessarily mean anything * * *. I'm a doodler. That's one of my problems. I doodle on paper." One evaluator admitted that no guidelines were provided to the graders on how to quantify particular failures on any of the tests. Another conceded that he had no specific training on grading the task tests. Evaluators also attempted to justify the low scores they gave plaintiff on the September 29 tests with general unquantifiable terms such as "tired out quickly during tasks," "fatigue caused lack of finesse/efficiency," "performed with a lack of smoothness," and "physically appeared to have difficulty with tasks." The evaluators, then, had the opportunity to introduce subjective (and therefore potentially illegitimate) factors into their scoring. Because two of the evaluators on the retest were the officers who had at the outset of plaintiff's

probationary period spoken to the Chief on behalf of line firefighters, urging him to accommodate their reservations regarding a gender-integrated department, it is at least a permissible inference that those evaluators attempted to give effect to the line firefighters' animus by impermissibly giving plaintiff lower scores than she deserved.

Further, plaintiff was subjected to a unique method of retesting; unlike earlier probationary firefighters, she was not immediately told what her mistakes were and then allowed a quick retake. Instead, she had to prepare again for all 26 task tests, not knowing which five she would actually be tested on. Although it is true that her situation, as well as its treatment, was unique—nobody had ever failed more than one test before, and she was afforded special training— her treatment was not only different but, arguably, worse. Where male firefighters were afforded a second chance to perform a known task, knowing what their mistake was, plaintiff was required to undergo complete repreparation and then to pass tests she had never taken before in a real test situation.

Those testing problems existed within a context revealing a general ambience of animus toward female firefighters. Firemen told plaintiff that they were having problems with their wives over the hiring of a woman. A senior member of the department, when Chief Bierwiler asked him to look into this matter, did not investigate, but merely spoke with some of the battalion chiefs about it. One firefighter agreed to be in a car pool with plaintiff, but indicated the next day that he had changed his mind after having spoken with his wife. Another testified that, after plaintiff had been unable to exit from a fire engine because the air tank she was wearing would not release from the back of the cab, he had her wear the air tank on all assignments, even when it was not necessary. One firefighter admitted that he told a senior department member that he did not like having to take the sexual harassment training that was instituted because a woman was being hired. He also told plaintiff, who in college was a world-class javelin thrower, that he was worried she would be unable to pull him out of a fire.

Finally, plaintiff's success as a firefighter before and after her experience in Medford provides circumstantial evidence of discriminatory treatment. A fire captain at the Valley Fire Service, now known as Rural/Metro Fire Department, where plaintiff worked before coming to Medford, testified that he had observed plaintiff satisfactorily perform some of the tasks she later failed in Medford. He also stated that plaintiff had no stamina problem. After she was terminated in Medford, plaintiff successfully completed the probationary period and passed the task tests to become a Firefighter I in Grants Pass. Several members of that department testified that plaintiff was a strong and able firefighter.

For the foregoing reasons, and guided by the precept that, when the credibility of a witness is an important factor in deciding a factual issue or an inference that can be drawn from one, we give considerable weight to the trial court's findings, we are persuaded that plaintiff has satisfied her burden to prove that gender was a substantial and impermissible factor in the city's decision to discharge her. The court correctly concluded that the city violated ORS 656.030(1)(a) when it discharged plaintiff.

Affirmed.